AMSTAR CORPORATION, Plaintiff-Appellee, *v.* TRANSPORT SERVICE COMPANY, Defendant-Appellant.

Fourth District No. 13796

Opinion filed May 2, 1977.—Modified on denial of rehearing June 30, 1977.

Hutton, Laury & Hesser, of Danville (Everett L. Laury, of counsel), for appellant.

Dobbins, Fraker & Tennant, of Champaign (D. Cameron Dobbins, of counsel), for appellee.

Mr. JUSTICE REARDON delivered the opinion of the court:

Plaintiff, Amstar Corporation, brought this action against defendant, Transport Service Company, seeking damages occasioned by the delivery of a contaminated product by defendant to the Danville Pepsi-Cola Bottle Company plant pursuant to plaintiff's direction. In a bench trial defendant was found liable. Defendant appeals, contending that the trial court's verdict is against the manifest weight of the evidence.

On April 28, 1971, defendant's tractor 211 and trailer 632 picked up a load of Crystal 80 Liquid Invert Sugar (hereinafter referred to as liquid sugar) at plaintiff's Chicago plant and delivered it to the Danville Pepsi plant. The Pepsi plant uses liquid sugar in its manufacture of soft drinks. It received all its liquid sugar from plaintiff.

The procedure at the Pepsi plant is for the liquid sugar to be delivered by a tank truck and pumped through a common pipe into either the east

or west liquid sugar storage tank (hereinafter referred to as sugar tank). Each sugar tank has a capacity of 4,200 gallons. The two tanks are linked by a connecting pipe through which liquid sugar could be transferred from one to the other. The liquid sugar is transferred from the sugar tanks through a common pipe into one of six syrup tanks where the finished soft drink product is mixed. This common pipe has a meter gauge which is used to determine the amount taken from the sugar tanks.

On May 11, 1971, while cleaning out a syrup tank, a Pepsi employee discovered an oily substance coming out of a valve thereon. Further inspection uncovered no other syrup tank contamination but contaminant was found in both sugar tanks. As a precautionary measure the contents of both sugar tanks, 2,800 gallons in the west sugar tank, last filled by defendant on April 28, 1971, and 4,000 gallons in the east sugar tank, last filled by another trucking company on May 10, 1971, were emptied and later resold. The products that had been made from the west sugar tank, namely Pepsi-Cola, Diet Pepsi-Cola, Orange, Grape, and Root Beer products, were recalled and destroyed. The 7-UP and Mountain Dew products, made solely from the east sugar tank prior to April 28, 1971, were not recalled or destroyed. The manufacturing portion of the Pepsi plant was closed down for cleaning.

Pepsi submitted its claim for damages to plaintiff and plaintiff paid Pepsi $28,599.51. Plaintiff, in turn, sought restitution from defendant. Defendant refused to reimburse plaintiff and plaintiff brought this action for damages.

At the October 28, 1975, trial Richard Newberry, syrup maker at the Pepsi plant, testified that he discovered the contaminant on May 11, 1971. Testifying from the Pepsi plant records, he stated that on April 28, 1971, defendant delivered 4,000 gallons of liquid sugar which was placed in the west sugar tank. Between April 28, and April 30, 1971, the contents of the east sugar tank were used. On April 30, 1971, the contents of both the east and the newly filled west sugar tank were used to make Pepsi-Cola. The liquid sugar from both sugar tanks went through the same common pipe to the syrup tanks. After April 30, 1971, only the west sugar tank contents were used in the manufacturing process. According to Newberry, the east and west sugar tanks' contents were not mixed through the connecting pipe during April or May, 1971, and no delivery of liquid sugar was made after April 28, 1971, or before May 10, 1971, the latter date's delivering being put into the east sugar tank. From his own knowledge he testified that no vegetable oil is used in the soft drink manufacturing process and that the sugar tanks are inspected every six months. He also stated that it was possible to transfer liquid sugar between the east and west sugar tanks in 1971.

Andrew Colonna, an engineer employed by plaintiff, testified that on

May 11, 1971, he rejected as unclean the truck and trailer defendant had sent to haul away the contaminated product. Colonna also took samples of the contaminated product. Dr. Henry Goldstein, a chemist for plaintiff, stated that he tested one of these samples and found it contaminated by vegetable oil.

Russell Amright, plaintiff's Chicago plant chemist, testified that the liquid sugar manufacturing process is performed in a sealed system with stringent contamination safeguards and that no vegetable oil is used in the manufacturing process. Amright had been given a sample taken from defendant's tanker 632 immediately after it was loaded on April 28, 1971, and he stated that upon testing the sample it proved to be free from contaminant.

At the trial, pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60) plaintiff called the executive vice president of Transport Services, Fred J. Eubeler, as a witness. He stated that his company no longer had the pertinent records for tractor 211 or trailer 632 as they had been lost by defendant's insurance company. Eubeler was able to testify, however, that tractor 211, which has pumps and hoses to load and unload, had hauled vegetable oil on April 19 and 23, 1971, and that trailer 632 had held vegetable oil on April 21 and 23, 1971, and liquid sugar on April 26, 1971. The vegetable oil hauled on April 23, 1971, was coconut oil, the same type vegetable oil found in a sample taken of the contaminated liquid sugar.

Defendant's first witness, William Stitziel, an insurance investigator, testified that on July 28, 1971, he had interviewed Newberry who told him that when the Pepsi plant was expecting a load of liquid sugar and had a partially empty sugar tank, their employees would transfer the sugar from one tank to the other so that the new load of 4,000 gallons would all fit into one 4,200 gallon tank.

Peter Valek, Joliet plant chemist for the Stauffer Chemical Company, stated that his plant received a load of liquid sugar from defendant on April 26, 1971, and that the load was free of any contaminant. Valek admitted that he did not personally inspect the shipment or run the tests on a sample from it.

John Nicola, defendant's dispatcher who claimed to have a photographic memory, stated that tractor 21 had hauled a load of vegetable oil on April 23, 1971, but that it had been thoroughly cleaned afterward. He also remembered inspecting trailer 632 on April 24, 1971, and finding it free of contaminants. Mr. Nicola's memory was not infallible, however, because he could not remember where the trailer had been prior to April 28, 1971, or which customers received which type of oil.

George Gause, defendant's chief tanker cleaner, testified that he could

not remember cleaning trailer 632 or tractor 211 during April, 1971. He stated that trailer 632 was never used to haul an inedible or coconut oil during this time but that, if it were, it would have been thoroughly cleaned.

Elmer Loy, the truck driver of tractor 211 and trailer 632 on April 28, 1971, testified to making a visual inspection of the rig prior to leaving defendant's terminal. He found it clean and tagged as cleaned by the cleaning department. According to Loy, when he arrived at plaintiff's plant, an employee of plaintiff inspected the rig and ran hot water through the pumps and hoses, filled the tank, took a sample, and sealed the load. Subsequently this seal was broken by a Pepsi employee.

At the close of the evidence the trial court determined that the contaminant came from defendant's April 28, 1971, delivery to the west sugar tank and awarded plaintiff $27,925.35.

On appeal the issue raised is whether the trial court's determination was clearly against the manifest weight of the evidence. Defendant contends that the trial court erred in its verdict because the plaintiff did not prove that defendant actually delivered a contaminated product. In support of its contention, defendant notes the lack of regular inspection of the sugar and syrup tanks, the possibility that the contaminant could have come from an earlier delivery to the east sugar tank, the possibility of transfer of contaminated product between the east and west sugar tanks, the testimony of its employees that the tractor 211 and trailer 632 were cleaned and inspected, and the discrepancy in the metered common pipe flow figures which leave approximately 600 gallons in the east sugar tank unaccounted for. Defendant suggests that these gallons were from the contaminated east tank and were mixed with the west sugar tank, thereby contaminating the west sugar tank.

■■ In order for a verdict to be against the manifest weight of the evidence, it must appear that conclusions contrary to those reached by the trier of fact are clearly evident. (*Valasquez v. Yellow Cab Co.* (1975), 32 Ill. App. 3d 934, 337 N.E.2d 365; *Bouillon v. Harry Gill Co.* (1973), 15 Ill. App. 3d 45, 301 N.E.2d 627.) In support of the trial court's verdict is the evidence that tractor 211 and trailer 632 had been used immediately prior to the April 28, 1971, delivery to haul vegetable oil. The trier of fact did not have the benefit of the cleaning records which would have allegedly shown that tractor 211 and trailer 632 were cleaned after the delivery of vegetable oil, because of the alleged loss of the records by the defendant's insurance company. Vegetable oil was found to be the contaminant in the Pepsi plant. Defendant's load of liquid sugar was used in the batch of product in which the contaminant was found. There is no evidence that the contaminant was in the Pepsi plant prior to April 28, 1971. The only products destroyed as possibly contaminated were those which might

have been made from liquid sugar from the west sugar tank. Newberry never stated that liquid sugar was transferred between sugar tanks in April or May, 1971. He merely stated in July, 1971, that it was done in the past and that it was still possible to do so. Newberry's trial testimony that the connecting pipe was not used in April or May, 1971, and that each sugar tank was used until empty negated defendant's meter figure argument. The trial court also discounted the testimony of Valek, Nicola, Gause, and Loy as either unpersuasive or suspect.

■■ Where the trial court sits as the trier of fact, it weighs the evidence and determines the credibility of witnesses. The trial court is in a better position than a court of review to determine the credibility of witnesses and the weight of the evidence presented and its findings are entitled to great weight on appeal. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 226 N.E.2d 624; *Tunprasert v. Prince* (1975), 33 Ill. App. 3d 710, 342 N.E.2d 244.) In this case the trial judge made findings based on the evidence in the record and determined the credibility of the witnesses. We hold that the trial court's determination is not contrary to the manifest weight of the evidence and we see no reason to substitute our judgment for that of the trial court.

Accordingly, we affirm the judgment of the trial court.

Affirmed.

HUNT and MILLS, JJ., concur.